UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FREDERICK DAVIS,

          Plaintiff,                        Hon. Ellen S. Carmody

v.                                         Case No. 1:15-cv-1269

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

          Defendant.

_____/


## OPINION

      This matter is before the Court on Plaintiff's challenge to Defendant's decision denying his application for disability benefits pursuant to a group long term disability policy.   The parties have consented to proceed in this Court for all further proceedings, including trial and an order of final judgment.   28 U.S.C. § 636(c)(1).   By Order of Reference, the Honorable Janet T. Neff referred this case to the undersigned.   The Court has determined that oral argument is unnecessary in this matter.   For the reasons discussed herein, Plaintiff's appeal is **denied** and this matter **terminated**.


## BACKGROUND

      As detailed herein, in January 2012, Plaintiff began to implement a plan to gradually, over the course of no more than twelve months, completely discontinue his medical practice and transition into other related employment.   In July 2012, prior to the completion of this transition plan, Plaintiff underwent a surgical procedure subsequent to which he experienced complications which Plaintiff asserts rendered him disabled from practicing medicine.

On January 3, 2013, Plaintiff submitted disability claims pursuant to several individual disability policies. Plaintiff's claims were denied after which Plaintiff initiated legal action. Plaintiff subsequently settled these claims and the action was dismissed. *Davis v. Northwestern Mutual Life Ins. Co.*, 1:14-cv-912 (W.D. Mich.). On February 5, 2015, Plaintiff submitted a disability claim pursuant to a group long term disability policy obtained through his employer, Michigan Pain Consultants, P.C., and administered by Defendant Northwestern Mutual (hereinafter, "the Policy"). (ECF No. 17-2 at PageID.425-28). Plaintiff's claim was denied, (ECF No. 1-3 at PageID.47-56; ECF No. 1-4 at PageID.58-67), prompting the present action.

## LEGAL STANDARD

The parties have stipulated that the de novo standard of review applies in this matter, pursuant to which the Court's role "is to determine whether the administrator. . .made a correct decision." *Ross v. Reliance Standard Life Ins. Co.*, 112 F.Supp.3d 620, 622 (W.D. Mich. 2015) (citations omitted). The Court's review is limited to the record that was before the administrator whose decision is accorded neither deference nor presumption of correctness. In sum, the Court "must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Ibid* (citations omitted).

## ANALYSIS

I.       Relevant Policy Language

With respect to the definition of disability, the Policy provides, in relevant part, that "[y]ou are Disabled if you meet one of the following definitions during the period it applies": (1) Own Occupation Definition of Disability; (2) Any Occupation Definition of Disability; or (3) Partial Disability Definition. (ECF No. 1-2 at PageID.22). Plaintiff argues that he satisfied the

Own Occupation Definition of Disability. Before addressing the parties' dispute over the meaning of the term Own Occupation, certain other relevant portions of the Policy must be noted.

As discussed below, Plaintiff terminated his employment with Michigan Pain Consultants on September 9, 2012. (ECF No. 17-7 at PageID.1726, 2017). The Policy provides that Plaintiff's insurance under the Policy ended on that date. (ECF No. 1-2 at PageID.30). Thus, to be covered by the Policy's disability provisions, Plaintiff must demonstrate that his disability began prior to September 9, 2012. Plaintiff must further establish that he was disabled continuously through his benefit Beginning Date, which is defined as the "181st day of Disability in the first 210 days after the date you became Disabled." (ECF No. 1-2 at PageID.15).[1]

The Policy also requires that Plaintiff have been under the care of a physician or practitioner during the time period of any alleged period of disability. (ECF No. 1-2 at PageID.30). Specifically, the Policy states, "[n]o benefits will be paid for any period of Disability when you are not under the ongoing care of a Physician or Practitioner." (ECF No. 1-2 at PageID.30). In sum, to be covered by the Policy's disability provisions, Plaintiff must demonstrate that he was unable to perform his Own Occupation prior to September 9, 2012, and that such disability continued for 180 days. Plaintiff must also have been under the ongoing care of a physician or practitioner during any claimed period of disability.

II.      Own Occupation

---

[1] This provision was subsequently modified, but such is inapplicable presently because the modification did not take effect until August 1, 2014, well after the relevant events. (ECF No. 1-2 at PageID.41-45). 180 days following September 9, 2012, is March 8, 2013.

Plaintiff argues that he is disabled because he was rendered unable to perform his Own Occupation.   The parties dispute how Plaintiff's occupation is properly defined for purposes of his disability claim.   The relevant Policy language provides as follows:

> Own Occupation Definition of Disability.
>
> During the period preceding your Beginning Date and during the Own Occupation Period[2] you are required to be Disabled only from your Own Occupation.
>
> You are Disabled from your Own Occupation if, as a result of Sickness, Injury, or Pregnancy, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation.
>
> You may meet the Own Occupation Definition of Disability while working in another occupation.

(ECF No. 1-2 at PageID.22).

> The Policy defines Own Occupation and Material Duties as follows:
>
> Own Occupation.   This is any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with your Employer.   Your Own Occupation is not limited to your specific job with your Employer or to your specific area of specialization, interest or expertise within the general occupation.
>
> Material Duties.   These are the essential tasks, functions and operations and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation.

(ECF No. 1-2 at PageID.23).

While there is no dispute that Plaintiff is a medical doctor licensed as an anesthesiologist, the parties nevertheless cannot agree as to the proper characterization of Plaintiff's Own Occupation.   The parties' dispute can be generalized thusly: Plaintiff seeks a

---

[2] The Policy defines Own Occupation Period as "the entire Maximum Benefit Period."   (ECF No. 1-2 at PageID.14-16).

4

characterization which focuses on the actual job duties he performed for Michigan Pain Consultants whereas Defendant seeks to characterize Plaintiff's occupation by reference to generic definitions of anesthesiologist. Despite being presented with information regarding Plaintiff's actual job duties, Defendant nevertheless defined Plaintiff's occupation by reference to two generalized definitions of anesthesiologist, one provided by the American Medical Group Association Compensation and Financial Survey and the other articulated by the United States Department of Labor. (ECF No. 1-3 at PageID.48-50; ECF No. 1-4 at PageID.61-62).

While there appears to be significant overlap between the parties' competing definitions, the fundamental shortcoming of Defendant's interpretation is that, by apparently disregarding the Material Duties that Plaintiff actually performed, Defendant largely ignores the first sentence of the definition of Own Occupation. Granted, Defendant's position is not completely unjustifiable in light of the relevant Policy language; however, Plaintiff's interpretation enjoys at least equal support in the Policy language. In the Court's estimation, the relevant language is ambiguous and confusing in which case such is construed in Plaintiff's favor. *See English v. Blue Cross Blue Shield of Michigan*, 688 N.W.2d 523 537 (Mich. Ct. App. 2004) (an insurance policy is a contract); *Auto Club Ins. Assoc. v. DeLaGarza*, 444 N.W.2d 803, 805-06 (Mich. 1989) (ambiguous contract terms are interpreted against the drafter).

Accordingly, the Court finds that the better reading of the relevant Policy language is that Plaintiff's Own Occupation is defined by reference to the Material Duties of Plaintiff's employment with Michigan Pain Consultants as of the date of Plaintiff's alleged disability, to the extent such are not inconsistent with or incompatible with the tasks an anesthesiologist might

generally perform. This does not terminate the inquiry, however, as there exists a legitimate question as to the precise nature of Plaintiff's job duties as of July 2012.

Dr. Mark Gostine, President of Michigan Pain Consultants, submitted a letter in which he articulated the job description of an interventional pain management physician working for Michigan Pain Consultants. (ECF No. 17-2 at PageID.578). According to Gostine, an interventional pain management physician treats patients experiencing chronic pain by performing various interventional procedures and also participates in medical group governance, professional advocacy, and various teaching and continuing education activities. (ECF No. 17-2 at PageID.578). Dr. Gostine described the physical and mental activity requirements of this position as: (1) the ability to treat an average of twenty-two (22) patients daily; (2) the ability to work 9-10 hours daily, five days weekly; and (3) the ability to daily perform twenty (20) highly technical interventional procedures all while standing and frequently wearing a ten pound x-ray resistant apron. (ECF No. 17-2 at PageID.578).

The Court notes, however, that Dr. Gostine did not describe *Plaintiff's* actual job duties, but instead described the general requirements of the position which Plaintiff held. Generally, this distinction would be without significance as, absent evidence to the contrary, it is not unreasonable to conclude that an employee performs duties consistent with the employer's job description. Here, however, there is compelling evidence, from Plaintiff himself, that his job duties, as of July 2012, were not nearly as extensive and demanding as Dr. Gostine suggests.

On July 15, 2011, Plaintiff moved in state court for a reduction of his court ordered spousal support obligations. (ECF No. 17-7 at PageID.2024). On February 10, 2012, the state court conducted an evidentiary hearing on the matter. (ECF No. 17-7 at PageID.2022-88). At

this hearing, Plaintiff testified, under oath to the following. Plaintiff described his medical practice as performing nerve block procedures. (ECF No. 17-7 at PageID.2078-79). Plaintiff reported that he previously performed "about" 22 such procedures daily. (ECF No. 17-7 at PageID.2078-79). Plaintiff further reported, however, that he had "substantially reduced [his] clinical activities" and was "working in a different capacity now."[3] (ECF No. 17-7 at PageID.2058).

Plaintiff, then aged 62, testified that he wanted to retire from the practice of medicine, but because "there is no replacement for me in my practice," he had "to take a strategy of gradually reducing my patient care by attrition so that the patients are not abandoned." (ECF No. 17-7 at PageID.2058-59, 2062). Plaintiff reported that beginning on January 1, 2012, he officially began his transition to retirement from the practice of medicine. (ECF No. 17-7 at PageID.2062-65). Specifically, Plaintiff testified that he was presently working "about 12 days a month," down from "16 to 18 a month" the previous year. (ECF No. 17-7 at PageID.2065). According to Plaintiff, working 18 days monthly was considered full-time. (ECF No. 17-7 at PageID.2067). Plaintiff continued that his plan going forward was to locate a physician to whom he could immediately transfer his practice. (ECF No. 17-7 at PageID.2065-66). However, in the event no such replacement could be located, Plaintiff would nonetheless "fully retire" from the practice of medicine no later than December 31, 2012.[4] (ECF No. 17-7 at PageID.2066).

---

[3] Because it did not appear relevant to the issues raised by Plaintiff's motion, neither the parties nor the court explored or attempted to more definitively define the different capacity in which Plaintiff was then employed.

[4] While Plaintiff subsequently discontinued practicing medicine on July 27, 2012, he nevertheless continued working, earning in excess of five hundred thousand dollars ($500,000.00) in both 2013 and 2014 pursuant to his practice group management endeavors. (ECF No. 15-5 at PageID.1602-03; ECF No. 17-7 at PageID.2101, 2193-2204; ECF No. 17-8 at PageID.2252-66).

The Court cannot discern from Plaintiff's testimony or anything else in the record the precise nature of Plaintiff's job duties as of July 2012. However, it is clear from Plaintiff's state court testimony that as of February 2012, he was working significantly fewer days each month. Specifically, Plaintiff testified that he was working twelve days monthly or approximately three days each week. There is nothing in the record to suggest that between February 2012 and July 2012, Plaintiff increased his workload. Thus, the Court finds that Plaintiff's Own Occupation consists of the general duties described by Dr. Gostine, except that Plaintiff was not working full-time, but instead was working only three (3) days weekly.[5]

III.    Examination of the Relevant Medical Evidence

On July 16, 2012, Plaintiff underwent a laser surgical procedure to treat: (1) obstructive benign prostatic hypertrophy [BPH] with a very large prostate, and (2) left renal calculus. (ECF No. 32-1 at PageID.2756-58). While this procedure "went smoothly and quickly," Plaintiff experienced "significant continued bleeding following the procedure." (ECF No. 32-1 at PageID.2781-82). Plaintiff thereafter underwent a procedure which confirmed "a clot present in the prostatic fossa and bladder." (ECF No. 32-1 at PageID.2781-82). The clot was removed and the area coagulated with a laser. (ECF No. 32-1 at PageID.2781-82). Plaintiff was subsequently diagnosed as having experienced an episode of disseminated intravascular coagulation (DIC). (ECF No. 32-1 at PageID.2829-40).

Treatment notes dated July 18, 2012, indicate that Plaintiff's condition was "much improved." (ECF No. 32-1 at PageID.2876). It was determined, based upon clinical assessment

---

[5] The Court notes that even if it were determined that Plaintiff was, as of July 2012, working full-time as he had previously, the result would be the same because, as discussed below, the medical record reveals that Plaintiff's ability to work was not, during the relevant time period, diminished for the requisite length of time.

and laboratory testing, that the most likely cause of Plaintiff's DIC episode was that such was simply a side effect of his prostate surgery rather than some other underlying pathology or cause. (ECF No. 32-1 at PageID.2904-06). Treatment notes dated July 19, 2012, indicate that Plaintiff was "hemodynamically stable" and his urine "remains very clear." (ECF No. 32-1 at PageID.2919-22).

Treatment notes dated July 20, 2012, indicate that Plaintiff was "much improved," "voiding spontaneously," and "ambulating without difficulty." (ECF No. 32-1 at PageID.2955-63). Treatment notes dated July 21, 2012, indicate that Plaintiff was "doing well." (ECF No. 32-1 at PageID.2987). The results of a physical examination were unremarkable and Plaintiff exhibited "normal" strength and range of motion and "normal" sensory and motor function. (ECF No. 32-1 at PageID.2996-97). Plaintiff's "hematology labs [were] stable/improving." (ECF No. 32-1 at PageID.2987).

Plaintiff was discharged from the hospital on July 22, 2012. (ECF No. 32-1 at PageID.3002-03). At discharge, Plaintiff was "feeling quite well" and "all of [Plaintiff's] blood cultures, urine cultures, and central venous catheter culture; all were negative." (ECF No. 32-1 at PageID.3002-03). Plaintiff was instructed to follow-up with a urologist in "approximately 6 weeks" to have a renal bladder ultrasound and postvoid residual bladder scan performed.[6] (ECF No. 32-1 at PageID.3005-06).

On July 24, 2012, Plaintiff was examined by Dr. Sead Beganovich, one of the doctors who treated Plaintiff during his DIC episode. (ECF No. 32-2 at PageID.3085-86). The doctor reported that Plaintiff was "currently clinically stable" with "no evidence of malignancy"

---

[6] There is no indication in the record that Plaintiff complied with these treatment instructions.

and "no evidence of liver disease." (ECF No. 32-2 at PageID.3085-86). Dr. Beganovich concluded that the "trigger" for Plaintiff's DIC episode was his prostate surgery and not some other underlying pathology. (ECF No. 32-2 at PageID.3086).

Dr. Beganovich also stated that "at the present time [Plaintiff] will not be able to work." (ECF No. 32-2 at PageID.3086). To the extent that this statement is interpreted as indicating that Plaintiff was permanently disabled or disabled under the Policy, the Court gives such no weight. First, Dr. Beganovich did not state that Plaintiff was *permanently* disabled, but instead simply concluded that Plaintiff was unable to work "at the present time," a reasonable conclusion under the circumstances. Also, there is no indication that Dr. Beganovich was aware of the precise nature of Plaintiff's professional duties, thus the doctor was not qualified to offer an opinion as to Plaintiff's ability to perform such going forward. Likewise, Dr. Beganovich did not articulate any specific functional limitations for Plaintiff, but, again, simply recognized that under the circumstances, Plaintiff was unable "at the present time" to return to work. Finally, Plaintiff's subsequent examinations by Dr. Humphries, discussed below, belie any argument that Plaintiff was disabled under the Policy.

On August 29, 2012, Plaintiff was examined by his treating physician, Dr. Gary Humphries.[7] (ECF No. 32-3 at PageID.3150-52). Plaintiff reported that he was experiencing "reduced stamina and weakness and some degree of mental slowness compared to his preoperative status." (ECF No. 32-3 at PageID.3161). The results of a physical examination, however, were

---

[7] The Court notes that Plaintiff only began treating with Dr. Humphries in May 2012 for purposes of a "routine pre-operative physical." (ECF No. 32-3 at PageID.3280). Thus, as of the date of Plaintiff's alleged disabling event, through the date by which Plaintiff was obligated to demonstrate his disability, Dr. Humphries did not have the sort of history treating Plaintiff which would have arguably afforded him greater knowledge and insight into Plaintiff's overall health and well-being. Moreover, under ERISA, the opinions of treating physicians are not accorded any increased weight or heightened deference. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829-31 (2003).

unremarkable. (ECF No. 32-3 at PageID.3151-52). The doctor reported that Plaintiff "made a steady, gradual recovery" from his recent DIC episode. (ECF No. 32-3 at PageID.3150). Dr. Humphries further reported that Plaintiff "has made good recuperation" and "feels well now." (ECF No. 32-3 at PageID.3150). The doctor also noted that Plaintiff's "weight and nutrition are good." (ECF No. 32-3 at PageID.3150). Dr. Humphries cleared Plaintiff to undergo a scheduled cataract surgery. (ECF No. 32-3 at PageID.3152).

On March 19, 2013, Dr. Anthony Norelli conducted a review of Plaintiff's disability claim. (ECF No. 32-13 at PageID.3796-98). The doctor concluded:

> Based upon the available documentation, there could be support for total limitations from 7/16/12 to 8/15/12 due to the acute DIC. Partial limitations from 8/15/12 until 8/29/12 could also be reasonable while he continued to convalesce. Support for limitations after 8/29/12 is not clear due to the absence of patient symptoms, treatment or followup directed at the history of DIC and complications. Had there been symptoms rising to a level of causing the stated limitations one would have expected Dr. Davis to seek evaluation and care directed at those symptoms. The fact that he was cleared for ophthalmologic surgery further suggests that Dr. Davis was doing rather well by 8/29/12.

(ECF No. 32-13 at PageID.3797).

With respect to Plaintiff's complaints of difficulty standing and walking, decreased endurance, and increased cold intolerance, Dr. Norelli concluded that there was no evidence in the medical record supporting such. (ECF No. 32-13 at PageID.3797). As for Plaintiff's reported "trouble with concentration," the doctor observed:

> One would have expected some difficulty with concentration in the convalescent period after the acute DIC due to the anemia. After that, had the cognitive issues continued to the point of impacting his function, one would have expected Dr. Davis to bring this concern to the attention of his physicians for further evaluation and treatment. Also, one would have expected to see cognitive

11

> problems with Dr. Davis' consulting work – which also does not
> receive any mention.

(ECF No. 32-13 at PageID.3798).

On April 3, 2013, Plaintiff transmitted to Dr. Humphries a letter questioning the doctor's failure to complete a disability form that Plaintiff had provided him. (ECF No. 32-3 at PageID.3164). In this letter, Plaintiff reported that, "[a]lthough I am doing well overall, I do not have the endurance to be working on my feet wearing a heavy lead apron for 10 hrs. /day." (ECF No. 32-3 at PageID.3164). Plaintiff instructed Dr. Humphries to complete the form in question and inform the insurance company that his condition was "unchanged since last report." (ECF No. 32-3 at PageID.3164).

On April 8, 2013, Dr. Humphries completed the disability form Plaintiff requested. (ECF No. 32-3 at PageID.3166-68). The doctor noted that he had neither treated nor examined Plaintiff in more than seven months. (ECF No. 32-3 at PageID.3167). Dr. Humphries nevertheless reported that Plaintiff was "extremely fatigued and not able to carry out his duties as previously practiced." (ECF No. 32-3 at PageID.3166). The doctor also reported that Plaintiff's "hemoglobin remains mildly anemic [in the] 12.9 range." (ECF No. 32-3 at PageID.3166). This particular conclusion, however, was based upon the results of laboratory tests performed by Dr. Beganovich more than eight months before.[8] (ECF No. 32-3 at PageID.3164). The Court notes that laboratory tests performed at the behest of Dr. Humphries shortly after completing this disability form revealed Plaintiff's hemoglobin to be 14.9, well within the normal range of 13.5-

---

[8] In his April 3, 2013 letter to Dr. Humphries, Plaintiff stated that he was including his "hematology report from Dr. Beganovich." (ECF No. 32-3 at PageID.3164). Dr. Beganovich last examined Plaintiff on July 24, 2012, only one week following Plaintiff's DIC episode, at which point the doctor noted that Plaintiff's "hemoglobin is getting better." (ECF No. 32-2 at PageID.3085-86).

17.5.  (ECF No. 32-3 at PageID.3178).   There is no indication in the record that Plaintiff's hemoglobin was ever tested between July 24, 2012, and April 8, 2013.

Dr. Humphries next examined Plaintiff on September 19, 2013.   (ECF No. 32-3 at PageID.3186-89).   Plaintiff reported experiencing "reduced stamina" and he reiterated that he was unable "to do the type of work and schedule that he previously maintained."   (ECF No. 32-3 at PageID.3186).   Plaintiff also reported that was "feeling OK" and "working 30-40 hours per month" for Pain Management Consultants.   (ECF No. 32-3 at PageID.3186).   The results of a physical examination were unremarkable.   Plaintiff exhibited full strength and range of motion in all his joints with no evidence of neurologic abnormalities.   (ECF No. 32-3 at PageID.3187-88). With respect to laboratory testing, the doctor noted that "the only area of concern is residual PSA." (ECF No. 32-3 at PageID.3186).   Dr. Humphries also reported that Plaintiff "is exercising most days" with "NO CV [cardiovascular] limitations."   (ECF No. 32-3 at PageID.3186).   The doctor further reported that Plaintiff "is riding his bicycle and goes to the Y regularly" and "pushed [his] HR [heart rate] to 135 for 45 min."   (ECF No. 32-3 at PageID.3186).

On October 10, 2013, Plaintiff requested that Dr. Humphries write a letter to the insurance company processing his disability claim.   (ECF No. 32-3 at PageID.3197).   Plaintiff specifically requested that Dr. Humphries state the following in his letter:

> 1) Dr. Humphries "has been providing on going care for the multi system organ failure that occurred secondary to [Plaintiff's] DIC";
>
> 2) Plaintiff "is physically unable to perform the duties of his job as an anesthesiologist/interventional pain physician due to chronic fatigue and the inability to wear the heavy lead aprons"; and
>
> 3)  Plaintiff's "condition is unlikely to change in the future."

(ECF No. 32-3 at PageID.3197).

13

That same day, Dr. Humphries authored a letter conforming to Plaintiff's instructions. (ECF No. 32-3 at PageID.3198).

On January 29, 2014, Plaintiff reported to the emergency room complaining of weakness and chest pain. (ECF No. 32-6 at PageID.3324). Plaintiff was admitted to the hospital for evaluation and treatment. (ECF No. 32-6 at PageID.3324). During his hospitalization, Plaintiff was treated by many medical professionals, including Dr. Amy Vanderwoude with the Cancer & Hematology Centers of Western Michigan, P.C. (ECF No. 32-8 at PageID.3746). Subsequent examination and testing revealed that Plaintiff was suffering deep venous thrombosis (DVT) and a pulmonary embolism (PE). (ECF No. 32-6 at PageID.3324-47). Plaintiff was discharged from the hospital on February 3, 2014. (ECF No. 32-6 at PageID.3378).

On February 10, 2014, Plaintiff was examined by Dr. Vanderwoude. (ECF No. 32-8 at PageID.3754). The doctor concluded that the only precipitating factor for Plaintiff's recent hospitalization was his frequent air travel. (ECF No. 32-8 at PageID.3746, 3754). Specifically, Dr. Vanderwoude stated, "[w]ith the exception of travel, there was no other obvious precipitating factor for thrombosis." (ECF No. 32-8 at PageID.3754). Plaintiff was not advised to discontinue his frequent air travel, but was instead simply treated with medication. (ECF No. 32-8 at PageID.3754).

On May 30, 2014, Dr. Craig Kessler completed an independent review of Plaintiff's disability claim. (ECF No. 32-11 at PageID.3777-81). The doctor noted that he was "basing his responses on the content of the medical records, on my 40 years experience as a board certified hematologist with specific clinical and research expertise in coagulation disorders, and upon my

knowledge of the medical literature." (ECF No. 32-11 at PageID.3777). With respect to Plaintiff's DIC episode, Dr. Kessler observed:

> the patient responded to resuscitative measures with replacement blood components and despite the multiple end organ damage related to sustained hypotension and hypovolemia, the patient recovered and his organ function normalized with time. At no time during the patient's hospital course was there any evidence of neurological consequences of the hypotension or multiple anesthesia exposures despite neurological checks per shift during the hospitalizations and there were never any subjective or objective findings of decreased mental acuity or fine motor deficits as a result of the peri and post-operative events and complications. This is important since Dr. Davis has not based his continued disability on his inability to operate, only his limited stamina and fatigue in the context that he cannot sustain the weight of his lead apron.

(ECF No. 32-11 at PageID.3778-79).

Dr. Kessler further observed that Plaintiff "recovered from [his DIC episode] and nowhere is there any objective indication of residual complications." (ECF No. 32-11 at PageID.3779). With respect to Plaintiff's complaints of decreased stamina, prolonged anemia, and increased sensitivity to cold, and Plaintiff's very limited record of medical treatment and examination, the doctor observed that "I am very surprised that if any of these symptoms were significant enough to alter his performance status that he never sought any medical evaluations for them." (ECF No. 32-11 at PageID.3780-81). Dr. Kessler further observed that Plaintiff's "current activities suggest a high performance status which would belie his claims of limited physical capacity." (ECF No. 32-11 at PageID.3780). Accordingly, the doctor concluded that Plaintiff was not experiencing any "limitations or restrictions" in his "ability to work his usual number of hours per day." (ECF No. 32-11 at PageID.3781).

On June 25, 2014, Dr. Norelli completed a follow-up report concerning Plaintiff's disability claim. (ECF No. 32-13 at PageID.3808-10). With respect to Plaintiff's reports of

extreme fatigue, Dr. Norelli referenced Dr. Humphries' September 19, 2013 observation, noted above, that Plaintiff was "exercising most days" without cardiovascular limitations and, moreover, that he was able to elevate his heart rate to 135 for four minutes.   (ECF No. 32-13 at PageID.3809).

Regarding such, Dr. Norelli noted that according to the American Heart Association:

> a heart rate of 135 is approximately 85% of maximum heart rate for a 63 year old man.   Ability to sustain 85% of maximum heart rate for 45 minutes speaks to an excellent level of endurance and conditioning at any age, and is inconsistent with the reported level of limitation due to decreased endurance and fatigue.

(ECF No. 32-13 at PageID.3809).

Dr. Norelli concluded that "there is no evidence of support for limitations for self-reported symptoms of fatigue and decreased endurance, anemia, coagulopathy or tremor after the end of August, 2012.   Dr. Davis' self-reported limitations and self-reported activity levels are inconsistent with one another."   (ECF No. 32-13 at PageID.3809).

On April 30, 2015, Plaintiff was examined by Dr. Derek Lado.   (ECF No. 32-12 at PageID.3783).   The doctor reported the results of his examination as follows:

> There is a very fine tremor of the right upper hand and digits, especially with increased attention and focus to an object.   Any type of targeted activity increases the tremor substantially.   I had him simulate a procedure as if he's holding a needle in his hand. He had very poor fine motor activity and was unable to meet the targeted area.
>
> UE strength is intact.   Sensation is intact.   His lower extremity strength is intact.
>
> I had him sit essentially on the wall in which this is a test of endurance.   The average person of average endurance can usually maintain this easily for 3 to 5 minutes.   He was unable to maintain this for more than 20 seconds.   His heart rate increased substantially, and his breathing increased with the use of accessory muscles.   I had to stop the test as he had a near fall.

16

I had him squat repetitively in which the average person of not great physical endurance can do this 15-20 times. He was only able to do this two to three times.

(ECF No. 32-12 at PageID.3786).

The doctor concluded as follows:

The alteration of his hemodynamics now put him at risk for possible increased blood clots and repeat pulmonary embolus.

At this time, I do not see where any additional treatment or care would be warranted.

It is what it is.

The significant initial complications and the sequelae has caused him to be significantly deconditioned and he has lost his physical/mental reserves. This is quite common for catastrophic events and prolonged recoveries like what Dr. Davis sustained.

These events have had a significant impact on Dr. Davis' life in multiple facets. He is still going through a very stressful litigation which has also caused him to have physical, mental, and emotional setbacks.

In my opinion, with the facts stated, this is a very straightforward case.

This individual is disabled, and is no longer able [to] perform any of the required tasks of his previous job.

(ECF No. 32-12 at PageID.3787).

On October 6, 2015, Dr. Lee Hartner completed a Peer Review Report regarding Plaintiff's disability claim. (ECF No. 32-10 at PageID.3766-74). As part of this review, Dr. Hartner spoke with Dr. Humphries and reviewed Plaintiff's medical record. (ECF No. 32-10 at PageID.3766-70). With respect to Plaintiff's DIC episode, the doctor concluded:

the medical information in the file supports the initial diagnosis of DIC in 2012. However, this resolved quickly at that time. His anemia was slower to recover, as expected, while his platelet count

> normalized relatively quickly.   He has not had evidence of ongoing
> DIC or recurrent DIC since that time.

(ECF No. 32-10 at PageID.3772).

The doctor further noted that examinations subsequent to Plaintiff's DIC episode revealed "no evidence of residual end-organ damage."   (ECF No. 32-10 at PageID.3770-71).   Dr. Hartner concluded that while Plaintiff was unable to work from July 16, 2012, through August 28, 2012, following this period of time, Plaintiff's ability to work, including wearing a lead apron, "would not have been limited. . .due to DIC."   (ECF No. 32-10 at PageID.3773).   The doctor further noted that:

> There is also no evidence to support restriction from any of [Plaintiff's work] activities due to DVT or pulmonary embolism. Records specifically fail to document any worsening in his symptoms due to DVT or PE (based on hematology follow up note after his hospitalization).   The note fails to mention any residual leg swelling, shortness of breath or difficulty with walking or standing. Given this documentation there is no support for his restriction from these activities due to his DVT or PE.

(ECF No. 32-10 at PageID.3773).

As noted above, to prevail on his claim, Plaintiff must establish that he was disabled from his Own Occupation prior to September 9, 2012, and continuously for 180 days thereafter. Plaintiff must also establish that he was under the ongoing care of a physician or practitioner during any claimed period of disability.   Plaintiff's claim fails both of these requirements.

Following his July 2012 DIC episode, through the 180 day period during which Plaintiff was required to establish that he was continuously disabled, Plaintiff was not under the *ongoing* care of a physician or practitioner.   During this period of time, Plaintiff participated in a follow-up examination conducted by Dr. Beganovich, who treated Plaintiff during his hospital stay.   Plaintiff was also examined by Dr. Humphries on August 29, 2012.   Plaintiff was not

18

examined or treated by a medical professional again until September 19, 2013. Such an infrequent schedule of examination and treatment hardly qualifies as *ongoing* care or treatment for an allegedly disabling condition.

As Dr. Kessler and Dr. Norelli both noted, were Plaintiff suffering the sort of limitations and complications that he alleged, it is not unreasonable to expect that Plaintiff would have been examined by and received treatment from his treating physician, or some other medical professional, more than twice in the fourteen (14) months after being discharged from the hospital following his allegedly disabling event. Thus, for this reason alone, the decision by Defendant to deny Plaintiff's claim was justified. Plaintiff's claim was also properly denied for a more fundamental reason, the medical record fails to establish that Plaintiff, following a brief recovery period, suffered a diminution in his ability to perform his Own Occupation prior to September 9, 2012, and which lasted continuously for 180 days.

As discussed above, the medical record reveals that Plaintiff's DIC episode was treated quickly and without residual effect. As Dr. Kessler concluded, Plaintiff "recovered from [his DIC episode] and nowhere is there any objective indication of residual complications." Plaintiff alleges that he was disabled due to "extreme fatigue," but the medical record revealed that as of September 19, 2013, more than *one year* after Plaintiff was required to demonstrate the onset of disability, Plaintiff was "exercising most days" and at a level that is inconsistent with his claims of disability. The record also reveals that during this period of time, Plaintiff was continuing to work part-time for his previous employer, travelling frequently, and, additionally, performing practice management duties sufficiently to earn more than $500,000 annually.

As for Plaintiff's January 2014 diagnosis of DVT and PE, such may very well have rendered Plaintiff unable to perform his Own Occupation, but such is not relevant because this circumstance occurred long after Plaintiff was required to establish disability. Moreover, there is no evidence that Plaintiff's January 2014 DVT and PE episode was in any way related to or caused by Plaintiff's July 2012 DIC episode. For similar reasons, the Court places very little weight on Dr. Lado's opinion that Plaintiff was disabled due to his inability to perform even simple physical activities. Dr. Lado did not examine Plaintiff until more than two and one-half years after Plaintiff was obligated to demonstrate disability.[9]

The Court is also not persuaded by Plaintiff's argument that Defendant acted improperly by failing to have him examined by its own medical professionals. This argument would have some vitality if the physicians who examined Plaintiff contemporaneously reported findings which supported Plaintiff's disability claim. *See, e.g., McCollum v. Life Ins. Co. of North America*, 495 Fed. Appx. 694, 703 (6th Cir., Aug. 21, 2012). The Court likewise disagrees with Plaintiff that the physicians which Defendant retained to review his medical records "second guessed" Plaintiff's care providers and made improper credibility determinations. The physicians who reviewed Plaintiff's medical records concluded that Plaintiff was not disabled based upon the fact that Plaintiff's own care providers did not report findings supporting Plaintiff's claim. This is distinct from a circumstance in which a plan administrator makes a determination to deny a disability claim by rejecting the results of examinations conducted by a claimant's care providers in favor of the opinions of reviewing professionals who did not examine the claimant.

---

[9] The Court also notes that Dr. Lado was previously employed by Michigan Pain Consultants. (ECF No. 32-12 at PageID.3789). While the Court is not suggesting that Dr. Lado was untruthful in his report, the fact that he was once employed by the practice group that Plaintiff founded and for which he was for many years employed calls into question the objectivity of the Dr. Lado's opinions and conclusions.

Finally, the Court also places little weight on the August 31, 2015 letter authored by Dr. Humphries. (ECF No. 32-3 at PageID.3279-97). In this document, Dr. Humphries attempts to rewrite and/or amend his previously authored contemporaneous treatment notes to characterize Plaintiff's DIC episode, subsequent treatment, and subsequent activities in a way which is simply inconsistent with the record, including his own contemporaneous treatment notes.

With respect to his August 29, 2012 observation that Plaintiff "has made good recuperation" and "feels well now," Dr. Humphries stated:

> I want to clarify, in case there is any misunderstanding, that these statements in my note, regarding Dr. Davis' improvement, must be read in context and understood for their intended purpose. Dr. Davis *did* make a good, steady, recovery following his acute DIC and stay in the ICU. This, however, is a relative statement. In short: he did well as compared to the ordinary outcome of acute DIC – which, statistically speaking, is *death*. He literally beat the odds by surviving; that is what I meant when I noted, with optimism, that "He has made good recuperation" and "He feels well now." He did very well compared to what could have been. He was well enough to go through a routine cataract surgery. But this should not be read as an indication that he was, in any way, back to a normal state of health – certainly not a state of health that would allow him to return to his former occupation.

(ECF No. 32-3 at PageID.3283-84).

This statement is not persuasive. First, as discussed above, such is simply inconsistent with the medical record and Plaintiff's many professional and personal activities. There is no dispute that Plaintiff experienced a serious and potentially fatal circumstance following his prostate surgery. However, the relevant question is not the severity of the episode, but whether the residual impact of such rendered Plaintiff disabled. Again, on this question, the record simply does not support Plaintiff's position. Later in his August 31, 2015 letter, Dr. Humphries states:

> There is no such thing as "recovery" from these events, in the traditional sense. DIC is not a disease in itself; it is the product of

underlying disorders, triggered in varying ways. Unfortunately, the DIC event in itself also resulted in the alteration of Fred's system. He continues, and will continue, to suffer from the very real problems that attend his condition, and altered system, which include: reduced stamina, rapid fatigue, ongoing weakness and instability, and most concerning *hand tremor*, have all been exhibited on a continuous basis since his initial DIC event in July 2012.

(ECF No. 32-3 at PageID.3291).

The Court finds this statement equally unpersuasive. First, the contemporaneous medical evidence simply does not support the statement that Plaintiff experienced reduced stamina, rapid fatigue, ongoing weakness and instability, and hand tremor "on a continuous basis since his initial DIC event in July 2012." As already discussed in detail, the medical record reveals that Plaintiff did not begin to experience these symptoms until after his January 2014 DVT/PE episode. While Dr. Humphries attributes this episode "to the DIC and the problems that led to the DIC," (ECF No. 32-3 at PageID.3291), the medical record reveals otherwise. As noted above, Dr. Vanderwoude, who treated Plaintiff's DVT/PE in the hospital, concluded that such was precipitated solely by Plaintiff's frequent air travel.

Dr. Humphries also argues that Plaintiff's DIC episode was prompted by an "underlying disorder," the effects of which Plaintiff continues to suffer. The medical record simply fails to support this assertion. As previously noted, Dr. Beganovich concluded that Plaintiff's DIC episode was not caused by any underlying pathology or "underlying disorder," but was instead merely an unfortunate side effect of his prostate surgery. As discussed above, Plaintiff's condition was immediately treated after which Plaintiff was "much improved" and was released from the hospital after a brief stay at which point Plaintiff was "hemodynamically stable" and "much improved." This is consistent with a notation in one of the journal articles included in

the administrative record which indicates that "[i]n some cases, the DIC will completely resolve within hours after resolution of the underlying condition."   (ECF 17-6 at PageID.1924).

## **CONCLUSION**

Following Plaintiff's July 2012 release from the hospital there is no evidence that Plaintiff was suffering the effects of any underlying disorder or pathology.   As Dr. Beganovich reported, following a July 24, 2012 examination, Plaintiff was "currently clinically stable" with "no evidence of malignancy" and "no evidence of liver disease."   The results of Dr. Humphries' August 2012 and September 2013 examinations of Plaintiff are inconsistent with Plaintiff's argument that he was disabled during the relevant time period.   Accordingly, for the reasons articulated herein, Plaintiff's challenge to Defendant's decision denying his claim for disability benefits is denied and this action terminated.   An Order and Judgment consistent with this Opinion will enter.


Date: February 26, 2018                                        /s/ Ellen S. Carmody
                                                                        ELLEN S. CARMODY
                                                                        United States Magistrate Judge